Thank you, Your Honor. Obviously, we have briefed quite a number of issues, and we don't have time today to address them all. So I think what I would like to do is focus in on the issues that we regard to be the sort of silver bullets in this case, the issues that absolutely compel reversal under well-established precedents of the Supreme Court and this Court. Perhaps the single greatest and most prejudicial error committed by the trial court was allowing insurance salesman Frank Kaleri to perform the roles of recipient witness, lawyer, judge and jury, all in the name of giving expert testimony on insurance industry standards. Now, as we pointed out in the briefs, there are many, many things wrong with the testimony that the court allowed Kaleri to provide over our objections. But I would like to focus now on two obvious errors that compel reversal under Supreme Court precedent and precedents of this circuit. First, it cannot be clearer under the Supreme Court's decision in Kumho and this Court's decisions in Ginro, Mukhtar and Hermannick that all forms of expert testimony, including expert testimony based on experience, must be screened for a liability before it may be admitted. Even though we brought these cases to the district court's attention, the district court, citing pre-Kumho precedent, refused to perform any reliability determination whatsoever, stating that the testimony of a bad faith expert is admissible so long as he is qualified and his testimony is based on his experience. And you'll find that, Your Honor. Assuming that's true, that in other words it was a mistake, is that like a per se reversible error, or do we look to see whether there was any prejudicial effect? In other words, whether, well, he didn't make the explicit ruling, but it looks like the expert was qualified anyway. Well, I believe under Mukhtar, Your Honor, it is reversible error, but I'd like to discuss with you why it's so clearly and highly prejudicial in any event. But before I do that, let me just refer you to the page where the judge ruled that he did not need to address reliability at all. You'll find it at page 271 of volume one of our excerpts of record. Now, as a result of this fundamental deviation from established law, the district court allowed Cleary to provide a wide range of opinions regarding the propriety of defendant's conduct that had no basis beyond his own say-so, and some of which actually conflicted with California law. To take a few examples, he testified that it is improper ever to dispose of drafts, that it is improper to engage in surveillance before receiving an insurer's medical records, that it is improper to fail to alert an insurer to potential coverage, even though California case law says that insurers have no duty to do so. That it is improper to construe an insurance policy that was approved by the California Insurance Department and hence is conclusively presumed to comply with California law, according to its literal terms. That it is improper to select an IME doctor that the insurer had and some of its sister companies had used on prior occasions, even though this particular IME doctor knew the plaintiff, had referred patients to her, and had received referrals from her. That it is improper to fail to provide the IME doctor with the policy's definition of total disability, even if the doctor is not being asked to render an opinion as to whether the insured is totally disabled. And here's my favorite, that it is improper to encourage claim handlers to assume an ownership mentality when performing their jobs. As Cleary conceded during cross-examination, the only source he had for any of these opinions was his own subjective notion of reasonableness. Because the district court abdicated any responsibility to test these and other of Cleary's opinions for reliability, Mukhtar compels that the court reverse and remand for a new trial. The second fundamental error committed by the district court has to do with the concept of fit. Putting aside the question whether Cleary's experience selling insurance policies, helping policyholders apply for benefits, and consulting for plaintiff's lawyers qualifies him to testify about claim handling standards, the district court allowed him to roam far beyond that limited area of expertise and instead to provide the plaintiff's spin on internal company documents and to testify about claim handling standards. He testified from them not only that Provident was engaged in all manner of improper practices, but also that Paul Revere adopted these practices after the merger and then proceeded to apply them to plaintiff. Now, let me give you an example, if I can, of what I'm talking about. If you could turn to page four of the excerpts of record, this is one of the plaintiff's favorite documents. And I realize not everyone may have it in front of them, and I hope you will go back and take a look at it in chambers. But this is a document that Cleary testified was a direction to claim handlers to alter claims files, to not fully document claims files, to destroy documents. Now, when you go back and look at this document, I think two things will be immediately clear to you. The first one is that on its face, this document was provided not just to claim handlers, but to all Provident employees in every department within the company, actuarial, underwriting, marketing, investor relations, the people in charge of investing the company's assets, HR people, and claims handlers. Secondly, the kind of advice contained in this document about confidentiality, thinking before one speaks, and shredding unnecessary documents of a sensitive nature is precisely the kind of advice that any responsible employer, including, I suspect, the members of this panel, would give to their employees. Yet in the guise of giving expert testimony about claim handling standards, Cleary was permitted to tell the jury that this, in fact, was a directive from the law department to the claim handlers to alter files and destroy documents. And he did the same thing with dozens of other internal documents. Beyond that, he was cross-examined on some of the documents, but the whole idea of allowing this to be the subject of cross-examination instead of the gatekeeping that a judge should do puts a totally unrealistic burden on the defendant. I mean, it's just drawing attention to all of the documents that the plaintiffs are claiming reflect that it's a bad company, and it's just causing more and more and more attention to be placed on stuff that has no real bearing on the case. So I don't think the fact that we could cross-examine on it was an adequate cure for the problem that the court sort of laissez-faire attitude to admission of the evidence created. Now, beyond allowing him to spin all of these documents, the court also allowed him to testify about Paul Revere's state of mind. And here's one example. He testified that Paul Revere hired the IME doctor, Dr. Schwartz, because Schwartz had never before found an insurer to be totally disabled. Now, on what basis does he have to testify about the corporate state of mind involved in making a decision about an IME doctor? Nothing in his experience. Did anybody object to that? Was that a direct examination? Yes. And did anybody object to that answer as being mind-reading and beyond the capability of the expert? Well, I don't remember if that particular question was met with a contemporaneous objection, but we had a detailed motion in limine. We had a detailed motion to strike all of his testimony that the judge denied. This record on Cleary was preserved every which way. There were many, many contemporaneous objections that just met with overruled from the bench. So although at the moment I can't tell you specifically whether this is. I'm just wondering if usually you have some cautionary instructions about the credibility, the weight and credibility of these experts. They get qualified sometimes minimally, but they get qualified and then they can give their opinion. Well, I think the problem. What cross-examination and argument are all about is to test the credibility and the effective value of that kind of evidence. Well, and we did do a good deal of that, Your Honor. But the problem is it is the trial court's job to limit the expert witness to testimony that fits his expertise. And the burden can't be on the defendant to have to deal with it when the trial court says, well, he's an expert. And that opens them up the door for him to basically stand in the shoes of the plaintiff's lawyer and say, take a look at this document. This says this is a terrible company. Take a look at this document. They're profiling claims. They're destroying documents, on and on and on. This is why they hired this claims handler, this IME doctor. We can, we did cross-examine. But we're entitled to the protection that the case law says we have with the gatekeeping function performed by the trial court to keep to limit the expert to testimony that's reliable and that's within the area of his expertise. Now, let me turn to some of our other issues. Was there a preliminary, on the eliminating motion, was there a preliminary hearing? That is, did the trial judge go through a kind of a Dahmer hearing on screening the experts, the qualifications and limitations on what they can testify to? Well, I mean, my co-counsel will correct me if my memory is wrong. My recollection is that there were written motions and then there was an argument at a hearing that was more like an oral argument than an evidentiary hearing. Is that right? Well, there was a preliminary. There were preliminary proceedings, though, so that both sides could be heard on what was going to happen at the trial. This wasn't a trial by ambush, was it? Well, it was a trial by ambush in the sense that the judge basically threw the doors open to let him say whatever he wanted to say over carefully preserved objections. And as I said, we moved in limine to limit or exclude his testimony at the outset. We objected throughout his testimony. And then another detailed motion to strike that said, this guy's testifying to things that are far outside his expertise. That was a specific ground in the motion to strike, and the judge met that motion with the statement, he's an expert, he can testify. Let me move on to the second evidentiary ruling that preordained the verdict in this case, and that involves the admission of the deposition testimony of Dr. William Feast, a former Provident Medical Director who left the company before the merger with Paul Revere. In our briefs, we set forth all the reasons why it was error to admit his testimony at all, but let me focus on just one here. Because Feast did not want to travel to San Francisco, the trial court employed the standards applicable to a precipient witness and ruled that plaintiff's counsel could read his deposition to the jury. Now, putting aside all of the other problems with his testimony that are set out in the briefs, that would have been fine if the district court had issued an order saying, just the facts, ma'am, but instead it allowed the plaintiff's counsel to read opinion testimony about the propriety of the practices. They say that rule is limited to precipient witnesses. Does it say that in so many words? Well, there's lots of case law that says. Ninth Circuit case law? I don't think the cases we've cited are in the Ninth Circuit, but they're Second Circuit, Tenth Circuit. There's nothing in the Ninth Circuit that limits that only to precipient witnesses, right? I don't think we have one cited, but I'm not sure that that should be a good reason to depart from the law You had time to go through it and see what you wanted to kick out of it so that it wouldn't all go in there as untreated. And we objected strenuously that he shouldn't be allowed to give this different testimony. And the great irony of it is after the judge admitted it on the ground that it was precipient testimony, when it was read and the objections from the deposition were then had to be ruled on by the judge at the trial, the judge said it's admissible as expert testimony. He has the qualifications. And if you have an opportunity to take a look at pages 46 through 48 of the supplemental excerpts, which is the thinner volume, it's incredibly stark. It wouldn't be that one, Judge Toshima. It's a very thin volume that we submitted with our reply brief. It's incredibly stark. He's giving this expert testimony based on his experience as a doctor who participated in claims, and the objections are raised and the judge says it's admissible as expert testimony. But as I said, if they wanted to have expert testimony on ethics of Providence claim handling practices, they could have hired an expert who would have come to court. I'm not saying that his precipient testimony was excludable on this ground, although we have other grounds. But the judge should have limited it to that, having admitted it under that lower standard. Let me move on to the next point, which involves the Providence documents that were admitted. Again, we have briefed this quite extensively, but I'd like to focus on one straightforward error pertaining to these documents. And that is that putting aside the propriety of allowing into evidence against Paul Revere documents created by Providence during a time when the two companies were still competitors, two of these documents, Exhibits 39 and 132, which you'll find in the excerpt of record at I believe page 2 is the first one, and pages I think it's 9 through 16 is the second one. Those documents were never established by the plaintiff to be Providence documents at all. The Providence employee who authenticated the other documents testified that he knew nothing about these two documents other than that they were produced during discovery in another case, which means they could have just come out of someone's filing cabinet. There was no testimony that they actually represented documents created by, maintained by in the regular course of business, Providence. And needless to say, that is totally inadequate to establish them to be Providence documents. Indeed, if you'll look at pages 11 to 12 of the excerpts, you'll see multiple references to the generic term INS period, CO period, which suggests to me quite clearly that it is a generic document and wasn't created by this company at all. Now, the admission of these documents was extraordinarily prejudicial. Both Kaleri and Plaintiff's Counsel relied on the first of the two, Exhibit 39, to establish that defendants were targeting claims for termination, and that Dr. Hangard's claim was one of the ones that was targeted. And then with respect to the second document, which is number 132, they used it for two very different purposes. First, they used it to establish that Paul Revere had an improper motive in calling for IMEs. And then they turned around and said Paul Revere did not follow its own protocol, which is identified in this document that has no other tie to the company, or no tie to the company, by not including the plaintiff's job description in the retainer letter for Dr. Schwartz, and by not ordering a functional capacity evaluation. So in other words, they're trying to say, well, look, you violated your own standards with a document that has no connection to the company. I see I'm running out of time quickly. I wonder if the Court would indulge me to just raise a couple of more arguments. You use it for time. You'll use it up and you have nothing left to remove. Okay. I'll reserve the rest, Your Honor. All right. Good morning, Your Honors. May it please the Court, I'm Daniel Smith for Appellee Dr. Joan Hangarter. Let me start for two minutes on what we've just been listening to and discussing. First, you have in this record in Volume 1 of the Appellant's Excerpts of Records, you have the decision of the district judge, a carefully thought out, detailed, well-reasoned resolution of all of the claims that have just been made to you of evidentiary error. And I commend that document to you, 62 pages that resolve all of these issues very thoughtfully and show why the judge made his rulings, and I'll get to specific reasons, but I encourage you, if you're at all persuaded by what you've just heard, to please check with the district judge and see his explanation of why he did what he did with respect to not only these issues, but with respect to the findings of bad faith and the support of the finding of reprehensibility for punitive damages. Turning to these specifically, Judge Goodwin asked about whether there was an objection raised to the testimony of Kaliri. And my understanding of the record is this, and I'm sure my colleague will correct me if I misstate it. There was a motion made at the beginning of the trial, and it was ruled on at page 23 to 25 of the transcript. And my notes indicate that the appellant's initial objection at that time was overruled by the judge, but he said, subject to a subsequent motion. And as I read the record, those motions were never made, those objections were never made. I just quickly reviewed that portion of the appellant's opening brief that deals with Kaliri. I didn't see any citation to any objection in their opening brief to his testimony. So I would suggest that this issue was waived as a first point. Their AOB pages are 46 to 58 of the opening brief. Now, was there an abuse of discretion? We suggest there was not, as the district court judge ruled because of Kaliri's extensive qualifications, his education in this area, his prior experience with these documents, his familiarity with these documents and with standards for denying claims. Well, the magistrate judge was clearly mistaken when he said Daubert didn't apply, right? I don't believe so, Your Honor. And case law is to the contrary on that point. Daubert and its progeny have to do with scientific evidence. Including Kumho Dyer? Yes, including Kumho. Those cases, that line of authority as I read it, has to do with scientific evidence that is brought into court for the first time by the expert who has been conducting experiments and is now going to tell the jury that the result of his testing and his scientific work is A, B, or C. And if that is not peer-reviewed, if that testing is not peer-reviewed, and if the district judge doesn't perform its gatekeeping function to keep junk science out of the courtroom, then if it's admitted, it is error and it could be a source of reversal. That is not what we have here. We don't have any scientific testing. This is not a case about science. Let me read from Kumho. In Daubert, the court specified it is the rule's word, knowledge, not the words like scientific. I'm sorry, Your Honor, I can't hear you. In Daubert, the court specified that it is the rule's word, referring to Rule 702, quote, knowledge, close quote, not the words like, quote, scientific, close quote, that modify that word but establishes a standard of evidentiary reliability. I understand Kumho to say that the principle of Daubert applies to all expert testimony, not limited to scientific. Well, if we understand it that way, to apply to the expert's knowledge, then this expert had the knowledge. So the question is, though, that whether the district court performed its gatekeeping function by making that determination one way or the other. He just simply said Daubert doesn't apply and he never made that determination, did he? He didn't. But if he had, it could only if he. Well, he he considered the basis of the objection. He said Daubert doesn't apply. But he certainly understood that the rules, the federal rules of evidence apply and that there has to be a substantial basis for the expert's opinion. And in this case, there certainly was not only from his education. We had nothing to review because the district court never made a ruling on. On the requirement under Kumho tire. Well, that's that's not a significant problem, because then the next step you have to go to is to look at the qualifications of this expert himself and ask yourselves if the if you believe Daubert applies, which was not conceding, then you have to ask yourself, well, if he had gone through that exercise, would he is there a reasonable probability that he would have reached a determination to exclude this witness? And I don't believe that that that conclusion can be sustained on this record. You have a man who whose advanced degrees or is that yes, his advanced degrees were in life and health insurance. He has then taken continuing education courses from this very defendant from Unum Providence and other insurance carriers. He's worked with insureds 25 to 50 times a year on their life, health and disability benefits. He has sold these policies. He specialized in this field for 25 years. He has seen in his office with claims how they are adjusted. He has firsthand experience with how they're investigated, how you get attending physician statements and medical records, and how you do a fair, thorough and objective evaluation of the claim. I don't think on this record you can say that it's reasonably likely that if the judge had decided Daubert applies, that he would have excluded the witness. And then let me get to the next point. If this witness had been excluded, is it reasonably likely that a different result would have obtained? And the answer to that question is no. For these reasons, Kaleri's testimony was only duplicative of other evidence. And the second reason is all of this evidence was unnecessary to the jury's finding of bad faith, which I'll get to in just a second. Where did he testify in the sequence of plaintiff's case? I believe he testified at the start. He was the very first witness? That's my understanding. Usually the first witness is not chosen by accident, is it? I would guess not. I wasn't the trial counsel, so. That experience as a trial counsel? I've tried a total of two cases. Well, in those cases, did you give much thought? Did you ever have more than one witness in a case? Let's assume that there was a reason for choosing the sequence of witnesses. Does that make a difference? It's difficult to assume that it wouldn't matter if he didn't testify. I mean, usually you start off with somebody who's going to be real good for your case. Well, if I could finish my thought, I think I can address that exactly. This is a case in which three or four witnesses who were present or former employees of the defendants all testified on this subject, and there was a wealth of documents that were authenticated from defendants all to the same point. Really, all Kaliri did was read the documents or put the documents in lay language for the jury. And what those documents showed and what Mr. Mone's testimony showed, and he was the engineer of this claims-cutting initiative, what the testimony of Sandra Frick, their nationwide litigation manager, showed, and Sullivan and Ryan and Dr. Feist, people with firsthand knowledge, all showed that at some point before this policy was purchased, Mone and other people organized a way to cut claims not because they weren't meritorious, but because they cost too much money and they were causing what's called in their documents adverse results. And therefore, we should, Mone's policy said, his claims initiative for terminating claims said, we should set a goal. We should set a goal that we benchmark the number of claims we're terminating in relationship to the number of new claims that are being filed. And our goal is to get to 80 percent in one document or 90 percent or even above that in other documents. Now, it is not good faith to terminate claims because they don't meet the insurance company's financial goals. And that's not a complicated concept. And Kaleri's testimony was not necessary to get for the jury to understand that this defendant had a scheme documented in a wealth of documents that Mone discussed and owned up to and acknowledged and that were supplied by this defendant and that are exceptions to the hearsay rule because they're business records. Those documents plus the testimony of Mone, Frick, Sullivan, and Ryan show that this scheme that started at Provident was applied to Paul Revere when Paul Revere was acquired. And her claim came underneath it. So my point, I have one or two points, and the first one is Kaleri was not necessary for the jury to understand that defendants had this scheme to cut claims to meet financial goals, not on the merits. My second point is this. If you just look and the jury just looks at how this specific claim was handled, without regard to the scheme to cut disability payments, that evidence reeks to high heaven of bad faith. And I want to turn to that now with your indulgence, Your Honors. I have offered you the termination letter of May 21st, 1999, and it shows time and again the bad faith of the defendants in terminating this claim. And I'm reading from page four of this letter, which is at excerpts of record 144, and there are three points on this page that are very significant. First is, and most obviously after they terminate the claim, they say, it appears your claim is governed by ERISA. This claim is not governed by ERISA. But what they knew would happen, and why they wanted her to believe that, is because ERISA does not allow for a jury trial. It does not allow for the damages that California law allows for. It would mislead her with respect to what she thought her rights were, and it would discourage an attorney from ever handling her case. So at page four of their termination letter, we have a false statement. They're not communicating honestly with her when they say, it appears your policy coverage is governed by the Employee Retirement Income Security Act, ERISA. That's a great way to keep yourself from being sued, is to lie to your insured about what their rights are. Is there other evidence established that the person who sent this letter knew it was a falsehood? I think the jury was entitled to infer that this company and this employee knew the difference between an ERISA claim and a non-ERISA claim. One of the documents of their own documents is to the effect of, here's why we want to move claims into the ERISA category, and they talk about no jury trial, no damages, things of that nature. I've got to tell you, I have trouble sometimes knowing what's governed by ERISA. So let me ask my question again. Is there anything that clearly indicates the company knew this claim was not covered by ERISA? Just the fact that it's an individual policy written to her, it has nothing to do with ERISA. If you know anything about ERISA, you know this is not an ERISA policy. And is there any evidence that the person responsible for this letter, not just Mr. Sullivan, but somebody actually responsible for making the decision to send this letter to her was conscious of that? And the answer may be no. I don't know. I want to know if there's something else. I can't think of anything else offhand, but I think it's shocking that they would make an unknowing false claim like that. Let's go to a couple of other points. Above higher up in the letter, which would be the second, third, and fourth paragraphs, they talk about whether she's working or not. And they deny different benefits by taking opposite positions on whether she's working. In the second full paragraph, it starts, We would also like to remind you of the definition of total disability, which states you are not engaged in other gainful occupation. And as we stated above earlier, it appears that you continued to work in your business and did take a draw from the business. That draw, incidentally, was funded by their own insurance policies. Therefore, regardless of the extent of your impairment, you would not qualify for total disability benefits under the terms of this contract because you're working. Well, they knew she wasn't working. They knew she wasn't working because if you go to the next paragraph, it says, As you may recall, you again met with our field claim representative, Mr. Ken Seaman, on April 30, 1999. Mr. Seaman met with you to provide our position on your claims to tell you we're denying it. At that time, you advised that you have now sold your business. So they know she's not working. And that's one of the elements that qualifies you for total disability. There are three elements. You're not able to perform the important duties of your occupation, which she wasn't. You're not working. And you're under the care of a physician. So they denied her total disability benefits on a false pretense that she was working when they knew she wasn't working. Then there's a provision in the policy that covers people who are working but don't earn the same amount of money that they used to earn. It's called residual disability. But you have to be working to get residual disability benefits because it compares your current reduced income to your income before disability. And now they switch fields and reverse their direction and say, since you have now sold your business and are not working, you would not qualify for overhead expense, nor would you qualify for residual disability benefits. Well, they can't have it both ways, and yet they do here within three paragraphs. They take opposite views of whether she's working or not to whatever suits their purpose. If they want to deny her total disability, they say she's working. And if they want to deny her residual benefits, they say you're not working. Now, which is it? The jury could infer bad faith from the insurance company misrepresenting the facts and misrepresenting the policy coverages to the insured in that letter. And now let me come to my third point. At the top of this page, they say, based on all the information in your file, it does not appear that you would be totally disabled under the terms of your contracts. And that is the biggest bad faith lie that they have told in this entire litigation to the insured. Since 1997, she did not treat patients except to see if she was improving, if she could do it. That's the testimony of Dr. Paimani, her coworker, who wrote this company a letter in 1998 and said she can't do any of her duties. Did they follow up on that? No. Did they have a duty to follow up on that? They sure did. The duty to conduct a reasonable investigation, as the jury was instructed, includes the duty to consider evidence of coverage. But they didn't consider evidence of coverage. Did they consider the MRI report of 1997, which showed mild spinal canal narrowing and stenosis? That's objective evidence that supports the pain that she was having. Did they consider that? No. Did they consider the 1996 MRI report that she had that showed deterioration in her shoulder and problems with her supraspinatus muscle? That was objective evidence of her right shoulder injury. Did they consider that? No. Did they consider Dr. Berry's, the treating physician, the treating chiropractor's opinion that she was totally disabled as of 1997? Did they consider and honor the opinion of Dr. Isono, another treating physician, who said you're disabled and you can't work and I'll check with you in a few months and see if you can work. And over a progressive series of visits, he always moved the date out further as to when she might be able to work, and he always said you're disabled right now. You cannot work. Yet they characterized him in their brief as a doctor who said she was not disabled. If it weren't so serious, it would be laughable. All of that they disregard in violation of their duty of good faith. And then we come to Dr. Swartz, their IME doctor. He was biased. They used him repeatedly. They got a financial obligation from him, and he never, on this record, never found one of their insureds disabled. They sent a letter to him, and they signaled to him what the conclusion could be, which was the same thing that Dr. Bianchi is quoted as saying in this letter, which is your injury should reasonably be expected to resolve with conservative treatment. Signal, signal. Here, doctor. Dr. Swartz, here's what you're supposed to find. Then Dr. Swartz didn't conduct an adequate examination. His letter never considered the things that I just told you about, the 96 MRI, the 97 MRI, the opinion of Dr. Berry, the opinion of Dr. Isono, none of that. He conducted a superficial examination. He avoided objective tests that would have showed that she was injured and couldn't lift the 20 to 50 pounds that she's required to lift in her job description. Excuse me. I only have 30 seconds left. Thank you, Your Honors. So these three points are the heart of our case. And allow this jury to determine that there was bad faith in the denial of this claim entirely without regard to the evidence that they object to from Kaleri and Feist. If you just look at how they mishandled this specific claim and ignored valid objective evidence of her disability, and in addition the pain that she complained of, they never questioned her credibility, they never doubted it, they admitted that pain can be disabling and qualifies you for total disability under this policy, and yet they denied her. But all the way through trial, there is no evidence that she could ever go back to her occupation as a chiropractor. We urge you to affirm the judgment. Thank you very much. Rebuttal. Thank you, Your Honor. First, I think if you noticed, Mr. Smith still hasn't tried to defend the ruling with respect to Feist or with respect to Exhibits 39 and 132. He didn't do it in his briefs, he didn't do it here, and I submit that's because there is no defense for them. With respect to his statement that the trial judge addressed all these issues, he's wrong again. The trial judge, other than saying that Daubert doesn't apply, didn't address any of these other points. Indeed, if you look at page 460 of the excerpts of record on Dr. Feist, he says, Dr. Feist was not offered as an expert so much as a percipient witness to defendant's claims handling practices. Well, if you go back and look at Feist's testimony, you can see that that's just totally inaccurate and that the judge was mistaken. Now, Mr. Smith went through a long recitation of what all of these documents supposedly show. That's fine for a lawyer. It's not fine for an expert witness. That's the point. Indeed, it's interesting that he admits that it wasn't necessary for Kaliri to do this, but he did it and dressed up in the garb of expertise. It surely had its impact. With respect to Dr. Paimani. Your time's up. Thank you very much. Thank you, Your Honor. All right. This case is now submitted for a decision. Last case on the calendar. The panel now stands in adjournment for the day. Thank you.
judges: Goodwin, Tashima, Clifton